## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                  No. 21-CR-665 MV

MICHAEL THEODORE ORTEGA,

       Defendant.


## MEMORANDUM OPINION AND ORDER

    This matter comes before the Court on Michael Theodore Ortega's Motion to Suppress

Evidence and Statements Derived as a Result of an Invalid Seizure and Search ("Motion") [Dkts.

144, 168]. The government opposed the Motion [Dkt. 159]. Having carefully considered the

briefs, evidence, and relevant law, and being otherwise fully informed, the Court will **DENY** Mr.

Ortega's motion in its entirety.

### BACKGROUND

    On the evening of April 8, 2021, New Mexico State Police Officer Andrew Pulido was

on patrol in a marked vehicle in Santa Fe. While driving northbound on Cerrillos Road, he

observed in front of him a maroon Chevrolet pickup truck distinguished by visible birdshot holes

and a broken-out rear driver's side window. Aware that a broken window was an indicator of

vehicle theft, and that automobile theft was a problem in the area, Officer Pulido decided to

query—or run—the truck's license plate in a computer database available to law enforcement.

He did so at 8:20:12 p.m.

    Two seconds later, at 8:20:14 p.m., Officer Pulido received his first noteworthy result:

the vehicle was registered to a wanted person, a Michael Theodore Ortega, who had a no-bond

warrant for driving on a revoked license and concealing his identity. Then, at 8:20:16, four seconds after running the truck's plate, Officer Pulido's patrol vehicle computer notified him that Mr. Ortega—a 5'9" white man with green eyes weighing 240 pounds—did not have a valid New Mexico driver's license, as his was revoked following a 2018 DWI arrest. Additionally, Officer Pulido was able to view Mr. Ortega's revoked driver's license photograph at least once, if not twice.

At 8:20:59 p.m., 47 seconds after typing the truck's license plate into his system and 43 seconds after being notified that Mr. Ortega's driver's license had been revoked, Officer Pulido initiated a traffic stop. It took the driver of the truck approximately 54 seconds to pull over. In that time, the driver veered over the solid white line twice and Officer Pulido advised dispatch that he appeared to be concealing or retrieving something underneath his seat. In this time, prior to the vehicles coming to a complete stop, the dispatcher orally reiterated the query results that instigated the traffic stop to Officer Pulido.

At roughly 8:22 p.m., the driver of the truck turned right on Cristo's Road and came to a stop, blocking the only entrance to the Santa Fe Auto Park, a business park containing at least five automobile dealerships and a self-storage business. Officer Pulido exited his patrol vehicle and approached the truck via the driver's side. Nervous about not being able to see the driver's hands, the officer instructed the driver to show them to him. The driver complied. Officer Pulido then asked for a driver's license. The driver rummaged around the truck but was unable to produce one. In that time, Officer Pulido asked the driver what he had been trying to stuff under the seat. The driver responded that he had dropped his Coke. From the officer's vantage point, nothing appeared wet in the truck's cab.

Because the driver did not have a license, Officer Pulido asked him to exit the truck and

accompany him to his patrol vehicle so that he could be properly identified. Hesitant to exit the truck, the driver volunteered his name: Michael Ortega. Following additional requests, Mr. Ortega eventually exited and notified the officer that he was the registered owner of the pellet-marred maroon truck. Officer Pulido informed Mr. Ortega of his outstanding warrant and initiated the warrant confirmation process. As Officer Pulido awaited warrant confirmation from dispatch, he asked Mr. Ortega whether he had any family members or significant others in Santa Fe who could pick up his truck in the event that the warrant was confirmed. Mr. Ortega related that he did not have family members in town but asked if he could call his girlfriend to effectuate the pickup. Officer Pulido agreed, asking him if he had a cell phone with which to place the call. Mr. Ortega responded that he did not. Officer Pulido then asked him for his girlfriend's telephone number so that he could use his own phone to place the call. Mr. Ortega responded that he did not know the number and that he only communicates through Facebook. At about 8:28 p.m., dispatch confirmed via radio that the warrant out for Mr. Ortega's arrest was in fact valid. Upon receipt of this information, and having been provided no reasonable alternative, Officer Pulido called for a tow truck to transport Mr. Ortega's vehicle to a secure location.[1]

Officer Pulido then conducted a search incident to arrest of Mr. Ortega and placed him in the back of his patrol vehicle. In doing so, he found a large sum of money in Mr. Ortega's pocket—$2,728 to be exact. Following the discovery of this cash, Officer Pulido asked Mr. Ortega if there were any valuable items in his truck that he should know about before it was

---

[1] Later, after the tow truck had already been called, but before the inventory search had commenced, Mr. Ortega offered to ask a "sister" in Bernalillo County to pick up his vehicle. There were two issues with this suggestion: 1) Mr. Ortega had no phone number for the alleged sister, and 2) she supposedly lived some 35-45 minutes away. Given how far away this person allegedly lived, Officer Pulido was certainly not obligated to give Mr. Ortega his cell phone to log into Facebook and contact her.

towed. Mr. Ortega responded that there were not. Officer Pulido clarified that he was required to produce an inventory sheet documenting everything in the vehicle since it was being towed. Asked why he had to search the vehicle to do so, Officer Pulido explained that he needed to document everything of value so that when the truck was eventually returned to Mr. Ortega law enforcement could ensure that no personal property was unaccounted for.[2]

Officer Pulido began the inventory search of the two-door truck at roughly 8:34 p.m. with the assistance of Officers Noah Valdez and Brenden Hill. As was customary in his practice, Officer Pulido started by opening the driver's door and searching the door panel. He then noticed, sitting on the driver's floorboard, a cell phone. Officer Hill, meanwhile, quickly identified two additional cell phones during his passenger side search of the truck's cabin. Under the driver's seat, inches away from the cell phone, Officer Pulido found a black bag that he then opened. That bag contained a 1911 Ruger pistol and clear-colored bags containing what he suspected to be methamphetamine. Officer Pulido called his supervisor to notify her of what he found during the inventory search. He was instructed to remove the firearm and suspected drugs, seal the vehicle, and apply for a search warrant. The inventory search ceased about two minutes and 20 seconds after it had started, upon discovery of the drugs. Mr. Ortega was read his *Miranda* rights at about 8:41 p.m.

Mr. Ortega is now proceeding to trial for a second time after being charged in a four-count Superseding Indictment and obtaining a mistrial on March 31, 2022. Dkts. 35, 116. Count 1 charges him with Possession with Intent to Distribute 50 Grams and More of Methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Dkt. 35 at 1. Count 2

---

[2] "Of value" here is defined in the New Mexico Department of Public Safety Policies & Procedures as having an apparent value of at least $25. *See* Dkt. 144-1 at 4.

charges him with Possession with Intent to Distribute Heroin, in violation of 21 U.S.C.

§§ 841(a)(1) and (b)(1)(C). *Id.* at 2. Count 3 charges him with Possession with Intent to

Distribute Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). *Id.* Count 4 charges

him with Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18

U.S.C. § 924(c)(1)(A)(i). *Id.* If convicted at trial, Mr. Ortega faces two mandatory minimum

sentences—10 years on Count 1 and 5 years on Count 4 (consecutive)—in addition to

discretionary statutory ranges of 0–20 years on Counts 2 and 3. Not to mince words: Counts 2

and 3 aside, Mr. Ortega will serve *at least* 15 years in federal prison if convicted of Counts 1 and

4. His second trial is scheduled to begin April 24, 2023. Dkt. 175 at 1.

### DISCUSSION

Mr. Ortega asserts that any physical evidence garnered during the traffic stop should be

suppressed because Officer Pulido lacked reasonable suspicion to execute the traffic stop and,

notwithstanding the legality of the stop, law enforcement improperly impounded Mr. Ortega's

truck. Dkt. 144 at 1–2. He also argues that any statements he made after he was arrested were

obtained in violation of the Fifth Amendment and must be suppressed. *Id*. at 16. The Court has

considered each of Mr. Ortega's arguments and finds them to be unfounded. Mr. Ortega's

Motion will therefore be denied.

### A.  The Traffic Stop Was Based on Reasonable Suspicion—and Therefore Legal.

Mr. Ortega relies on a far too myopic reading of *Kansas v. Glover*, 140 S. Ct. 1183 (2020)

for suppression of the physical evidence in this case. Dkt. 168 at 2. In his mind, additional facts

should have dispelled Officer Pulido's reasonable suspicion under *Glover*, rendering the stop

unconstitutional.[3] *Id*. His argument fails.

---

[3] According to Mr. Ortega, that "exculpatory information" was 1) the driver of the truck was bald

A traffic stop is a seizure for Fourth Amendment purposes. *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015). Warrantless traffic stops are valid where the officer has reasonable suspicion to believe that a traffic violation occurred. *Glover*, 140 S. Ct. at 1187; *see also Delaware v. Prouse*, 440 U.S. 648, 663 (1979) (A police officer may stop a motorist if the officer has "articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law"). "Reasonable suspicion" is "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). The inquiry depends on "the totality of the circumstances." *Navarette v. California*, 572 U.S. 393, 397 (2014) (citation omitted).

Indeed, the emphasis of the inquiry is on the "whole picture," *Cortez*, 449 U.S. at 417, and rejects a "divide-and-conquer analysis" of a situation's relevant factors. *United States v. Arvizu*, 534 U.S. 266, 274 (2002). While a mere "hunch" is not enough, "the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette*, 572 U.S. at 397 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)) (internal quotation marks omitted); *Arvizu*, 534 U.S. at 277 (The reasonable suspicion inquiry "falls considerably short" of 51% accuracy); *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) ("[t]o be reasonable is not to be perfect").

Whether or not the government has satisfied its burden of proof to justify warrantless

---

(not with brown hair, as stated in the warrant) and 2) he appeared to be heavier than the weight described in the warrant (this is different from his position in his opening brief that it was impossible to tell from the officer's vantage point what his height and weight were). Dkts. 168 at 2, 144 at 4.

searches and seizures is judged by "the officer's conduct in light of common sense and ordinary human experience." *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010) (quoting *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997)). Courts consider "the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *United States v. McRae*, 81 F.3d 1528, 1534 (10th Cir. 1996) (internal quotation marks omitted). Finally, evidence is weighed "not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement," keeping in mind that officers aware of the modes and patterns of operation of certain kinds of lawbreakers can draw inferences and make deductions that "might well elude an untrained person." *Cortez*, 449 U.S. at 418.

Mr. Ortega is correct in one regard: *Glover* is particularly relevant to the question before the Court—but not for the reasons he argues. In *Glover*, a police officer stopped a vehicle after running a record check and learning that the license of the vehicle's registered owner had been revoked. *Glover*, 140 S. Ct. at 1187. While the officer did not see the driver before conducting the stop, the officer's commonsense inference that the owner of a vehicle was likely the vehicle's driver provided "more than reasonable suspicion to initiate the stop." *Id*. at 1185. Furthermore, "[t]hat inference [was] not made unreasonable merely because a vehicle's driver is not always its registered owner or because [Mr.] Glover had a revoked license." *Id*. The Supreme Court noted that though common sense suffices to justify the officer's inference, empirical studies and state license revocation schemes demonstrate that drivers with suspended or revoked licenses frequently continue to drive. *Id*. Accordingly, "[w]hen the officer lacks information negating an inference that the owner is driving the vehicle, an investigative traffic stop made after running a vehicle's license plate and learning that the registered owner's driver's license has been revoked is reasonable under the Fourth Amendment." *Id*.

While the Court in *Glover* held that, under the totality of the circumstances, the deputy in that case drew "an entirely reasonable inference" that the accused was driving while his license was revoked, it emphasized the narrowness of its ruling. *Id*. at 1191. Indeed, "the presence of additional facts might dispel reasonable suspicion." *Id*. (citation omitted). The Court gave an example of facts that might do just that: "if an officer knows that the registered owner of the vehicle is in his mid-sixties but observes that the driver is in her mid-twenties, then the totality of the circumstances would not 'raise a suspicion that the particular individual being stopped is engaged in wrongdoing.'" *Id*. (citations omitted). This is the situation that Mr. Ortega argues is present here.

Mr. Ortega's case is no *Glover* exception. Officer Pulido's stop of the truck was clearly based upon reasonable suspicion that Mr. Ortega was committing not one, but two New Mexico traffic violations and that he had an active warrant for his arrest.[4] The evidence before the Court strongly suggests that Officer Pulido was aware of this information before initiating the stop. In fact, the report that was generated following the license plate query, Dkt. 159-1, and testimony from Officer Pulido himself indicate that he was made aware of Mr. Ortega's revoked license 43 seconds before he initiated the stop. *See* Motion Hearing Transcript at 20:3–4. These facts put this case on all fours with *Glover*. And in briefing and at the evidentiary hearing, Mr. Ortega failed to rebut the reasonable inference that Mr. Ortega was driving his own truck or show that Officer Pulido possessed any exculpatory information. Instead, he argued that because the driver's hair differed from the description on his revoked license (bald instead of brown), the officer's reasonable suspicion should have dissipated. Dkt. 144 at 8; Mot. H'rg Tr. at 61:2–3,

---

[4] Those traffic violations were 1) Driving on a Revoked License and 2) Driving Without a Valid License. *See* N.M. Stat. §§ 66-5-39.1, 66-5-2.

63:11–12, 63:14, 63:18–20. Not so. This, like weight, which he also unconvincingly argued, is an easily mutable characteristic—especially over time (the warrant was issued some three years earlier). Dkt. 168 at 2. A new haircut, hair loss, or weight gain was not the scenario the Supreme Court in *Glover* envisioned. On the contrary, it involved two radically different people: a man in his mid-sixties and a woman in her mid-twenties.

As the evidentiary hearing made clear, the government has met its burden to prove "a particularized and objective basis for suspecting [Mr. Ortega] of criminal activity." *Cortez*, 449 U.S. at 417–18. And because Officer Pulido possessed no exculpatory information—let alone sufficient information to rebut the reasonable inference that Mr. Ortega was driving his own truck—the stop was justified and entirely constitutional. *See Glover*, 140 S. Ct. at 1119.

### B.  Officer Pulido Properly Impounded Mr. Ortega's Vehicle

Because Officer Pulido had reasonable suspicion to effectuate a traffic stop, the Court's eye turns to the legality of the warrantless search of Mr. Ortega's truck. Put simply, Mr. Ortega challenges the legitimacy of the inventory search, a well-established exception to the warrant requirement, in order to suppress the inculpatory physical evidence found by law enforcement. *United States v. Trujillo*, 993 F.3d 859 (10th Cir. 2021) controls the outcome of this case and requires the denial of Mr. Ortega's motion.

In *Trujillo,* the Tenth Circuit reversed a suppression order from this Court under analogous factual circumstances. Ultimately, the panel held that the vehicle search was justified as an exercise of law enforcement community-caretaker functions under *South Dakota v. Opperman*, 428 U.S. 364 (1976). *Trujillo*, 993 F.3d at 862. *Trujillo* dealt with the impounding and subsequent search of a vehicle parked in front of, and blocking, the entrance to a gated community. *Id*. Mr. Trujillo was arrested for failing to pull over in response to a police

command. *Id*. Consistent with the policy of the Bernalillo County Sheriff's Office, the officer

determined that the car should be impounded and towed. *Id*. The policy required that a vehicle be

towed when the driver had been arrested and there was no registered owner to take custody. *Id*.

Additionally, as in this case, the officer thought it would be dangerous to leave the vehicle where

it was, both because its location presented a danger to other drivers and because of the risk that

someone would burglarize the vehicle. *Id*. Before towing Mr. Trujillo's car—and again

consistent with department policy—the officer performed an inventory of its contents. *Id*. This

search produced contraband similar to what was found in Mr. Ortega's vehicle, and he

subsequently faced similar charges in this Court to those Mr. Ortega now faces. *Id*. at 863. Mr.

Trujillo ultimately pleaded guilty to avoid the ten-year mandatory minimum that accompanies a

21 U.S.C. §§ 841(a)(1) and (b)(1)(A) conviction and will be sentenced later this year and subject

to a lower mandatory minimum than Mr. Ortega.

And yet Mr. Ortega raises the same arguments Mr. Trujillo raised before this Court in 2018:

1) that the evidence recovered during the inventory search should be suppressed on the ground

that his Fourth Amendment rights were violated by the way the inventory search was conducted,

and 2) that the warrantless impoundment was unreasonable because there was no community-

caretaker basis for impoundment and the officer failed to consider alternatives to towing. *Id*.; *see

generally* Dkt. 144. This Court ruled against Mr. Trujillo on the first issue and for him on the

second. *Trujillo* at 863. The Tenth Circuit reversed on appeal of the second issue, finding the

Court had erred in holding that "the government ha[d] not carried its burden of showing that [the

officer's] decision to impound [the accused's] car was justified by the need to protect public

safety or to facilitate the flow of traffic."[5] *Id*. at 864. In *Trujillo*, the search of the accused's

---

[5] As in this case, the government bore the burden of demonstrating the reasonableness of the

vehicle was justified by the Tenth Circuit on two separate community-caretaking grounds. Relevant to this case was the first, based on *Opperman*, where the court held that "when an unoccupied vehicle would impede traffic and the registered owner cannot readily arrange for someone to drive it away, law-enforcement officers may impound the vehicle." *Id.*

*Opperman* held that both impoundment and search of a parked vehicle were "not unreasonable" under the Fourth Amendment under factual circumstances less pressing than those before the Court today. 428 U.S. at 376. Addressing impoundment, the Supreme Court recognized law enforcement's authority to remove vehicles "[i]n the interests of public safety and as part of what the Court has called 'community caretaking functions,'" noting that more than 100,000 cars were towed from New York City streets in 1969 alone. *Id.* at 368–69 (quoting *Dombrowski*, 413 U.S. at 441). The Court described the contours of that authority as follows:

> To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be removed from the highways or streets at the behest of police engaged solely in caretaking and traffic-control activities. Police will also frequently remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic. The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.

*Id.* at 368–69 (footnote omitted). As the Tenth Circuit in *Trujillo* noted, "[i]t is important to recognize the breadth of what is encompassed by 'efficient movement of vehicular traffic,' 'impeding traffic,' and 'public safety and convenience.'" 993 F.3d at 865 (citation omitted). It elaborated:

> The impounded automobile in *Opperman* was in a lawful parking spot. Perhaps between 2:00 a.m. and 6:00 a.m. it was blocking street-maintenance work, but when it was impounded the sin was parking overtime. A more recently arrived vehicle could have lawfully parked there. It was not blocking the flow of traffic. As far as one can discern from the Supreme Court opinion, the only way in which

impoundment. *See United States v. Taylor*, 592 F.3d 1104, 1107 (10th Cir. 2010).

the vehicle was impeding traffic was by reducing the number of available parking
spots, perhaps requiring drivers of other vehicles to waste time and slow traffic
while searching for other places to park.

*Id*.

The Supreme Court again addressed the constitutionality of impoundments and inventory

searches in *Colorado v. Bertine*, 479 U.S. 367 (1987). There, Boulder, Colorado police arrested

Steven Bertine for driving while under the influence of alcohol. *See id.* at 368. After deciding to

impound Mr. Bertine's van, officers performed an inventory of its contents, discovering

"controlled substances, cocaine paraphernalia, and a large amount of cash" inside a closed

backpack. *Id.* at 369. The Court upheld the inventory search, stating that in the absence of any

"showing that the police, who were following standardized procedures, acted in bad faith or for

the sole purpose of investigation," the governmental interests in securing the property and

"avert[ing] any danger" it may have posed to police or others outweighed Mr. Bertine's Fourth

Amendment interests. *Id.* at 372–73.

Moreover, the Court rejected the argument that the impoundment and inventory were

improper because the property could have been secured through alternative, less intrusive means,

stating: "[W]hile giving [Mr.] Bertine an opportunity to make alternative arrangements would

undoubtedly have been possible, ... '[t]he real question is not what "could have been achieved,"

but whether the Fourth Amendment *requires* such steps.'" *Id.* at 373–74 (quoting *Illinois v.

Lafayette*, 462 U.S. 640, 647 (1983)). The Court also rejected Mr. Bertine's argument that the

impoundment was unconstitutional because "departmental regulations gave the police officers

discretion to choose between impounding his van and parking and locking it in a public parking

space." *Bertine*, 479 U.S. at 375. Nothing precluded the exercise of officer discretion in

impoundment decisions, the Court reasoned, "so long as that discretion is exercised according to

standard criteria and on the basis of something other than suspicion of evidence of criminal

activity." *Id.* Although "departmental regulations gave [Boulder] police officers discretion to

choose between impounding [a vehicle] and parking and locking it in a public parking space,"

the Court determined that such discretion *was* exercised according to sufficiently standardized

criteria—namely, "several conditions that must be met before an officer may pursue the park-

and-lock alternative," including a prohibition on pursuing that alternative "where there is

reasonable risk of damage or vandalism to the vehicle or where the approval of the arrestee

cannot be obtained." *Id*. at 375–76.

In *Trujillo*, the Tenth Circuit read *Bertine* to mean that "law-enforcement officers are not

required to accommodate every request to avoid impoundment of a vehicle that is impeding

traffic." 933 F.3d at 866. It went on to note that this idea "was implicit in *Opperman*, where there

was no suggestion that the officer needed to go out of his way to contact Mr. Opperman or

otherwise delay performance of his other duties before having the vehicle towed." *Id*. "On the

other hand," the Tenth Circuit felt "confident that if Mr. Opperman had arrived at his vehicle

while the officer was noting that it had been parked there too long, the Supreme Court would

have thought it unreasonable for the officer to have the vehicle towed when Mr. Opperman could

have moved the vehicle himself (assuming, of course, Mr. Opperman could establish his

ownership and carried a driver's license)." *Id*.

In the years since *Opperman* and *Bertine*, the Tenth Circuit has approved impoundments

in a variety of community-caretaker contexts and, almost without exception, has upheld

impoundment of vehicles pulled over on public roadways. *See, e.g.*, *United States v. Horn*, 970

F.2d 728 (10th Cir. 1992); *United States v. Haro-Salcedo*, 107 F.3d 769, 771 (10th Cir. 1997);

*United States v. Hunnicutt*, 135 F.3d 1345, 1351 (10th Cir. 1998); *Taylor*, 592 F.3d at 1106–08;

*United States v. Long*, 705 F.2d 1259, 1262 (10th Cir. 1983); *United States v. Shareef*, 100 F.3d 1491, 1508 (10th Cir. 1996). The sole exception to the Tenth Circuit's general approval of impoundment of vehicles stopped on a public roadway is *United States v. Ibarra*, 955 F.2d 1405 (10th Cir. 1992), where the Tenth Circuit upheld the district court's decision to suppress the evidence in light of a confluence of special circumstances. As the Tenth Circuit summarized that decision in *United States* v. *Sanders*, 796 F.3d 1241 (10th Cir. 2015), "the officer's decision to impound the vehicle did not meet any of the criteria for impoundment under Wyoming state law"; the driver (whose license had expired) was not arrested and was not permitted an adequate opportunity to make arrangements for custody of the vehicle; and, perhaps critical to the conclusion, the officer's testimony regarding the public safety reasons for the impoundment was not credible, suggesting (along with substantial other evidence) that the reasons given were pretextual. *Id*. at 1246 (citation omitted).[6]

*Trujillo* and the cases on which it is based compel denial of Mr. Ortega's motion. The hazard posed by Mr. Ortega's truck easily satisfies *Opperman*: it blocked the only entrance to the Santa Fe Auto Park—a piece of land containing hundreds of vehicles that come and go by necessity. Moreover, the Court heard testimony that the position of the truck, as it was left by Mr. Ortega, prevented other cars from passing his truck to enter the auto park. Mot. H'rg Tr. at 53:17–24, 110:20–22. So positioned, the truck threatened both the "safety and convenience," *Opperman*, 428 U.S. at 369, of any auto park visitors or employees, who, at the very least, would

---

[6] Mr. Ortega's truck was, for all intents and purposes, parked (at least partially) on public property, justifying Officer Pulido's exercise of law enforcement community-caretaker functions. Regardless, the Tenth Circuit has also upheld impoundment of vehicles parked in private lots and other locations where unoccupied vehicles may still constitute nuisances, although their impact on traffic is questionable. *See, e.g.*, *United States v. Kornegay*, 885 F.2d 713, 716 (10th Cir. 1989); *United States v. Johnson*, 734 F.2d 503, 505 (10th Cir. 1984) (per curiam); *United States v. Martin*, 566 F.2d 1143, 1144–45 (10th Cir. 1977).

be inconvenienced by having to wait for the truck to be removed and, at worst, might collide with the truck or another vehicle. Even if some cars could have navigated around the truck, that does not mean that the truck was not "impeding traffic or threatening public safety and convenience." *Opperman*, 428 U.S. at 368–69. If passing by the truck would have been a tight squeeze, the necessary maneuver would "slow traffic" and might lead to minor damage. *Trujillo,* 993 F.3d at 865. And since incoming drivers would not be expecting a vehicle in the driveway, there was opportunity for a more serious collision with the truck parked to the side even if there was ample room for the other vehicle to pass it. The truck also would have made it difficult, if not impossible, for wider-bodied emergency vehicles such as ambulances or firetrucks to pass if needed within the complex. Mr. Ortega's insinuation that this all could be averted simply by entering the grounds via the exit is absurd; one traffic violation does not excuse another. Mot. H'rg Tr. at 135:19–20.

Given the hazard presented by the truck, the officers' decision to impound the vehicle was entirely reasonable. Mr. Ortega was given the opportunity to give Officer Pulido the names and phone numbers of licensed drivers who could retrieve it. Instead, he lied about not having a phone (three were found in plain sight), and the only "viable" option ever suggested was a "sister" some 35-45 minutes away. The deputies were not required, as Mr. Ortega boldly suggests, to allow him to use their phones to ask someone via Facebook to come pick up his truck and then, assuming he was successful, wait for some indeterminate amount of time for the substitute driver to arrive. Dkt. 144 at 12.

On the contrary, the Court is aware of no caselaw that would question the reasonableness of impounding under these circumstances. *See Bertine*, 479 U.S. at 374, 107 ("The real question is not what could have been achieved, but whether the Fourth Amendment *requires* such steps ...

[.] The reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative less intrusive means." (original brackets and internal quotation marks omitted)); 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 7.3(c), at 822 (5th ed. 2012) (After *Bertine*, "[i]t ... seem[s] reasonably clear that the failure to give a person an opportunity to make reasonable alternative arrangements for the vehicle would not invalidate an inventory search under Fourth Amendment principles." (internal quotation marks omitted)). This proposition from *Bertine* has been regularly followed in the Tenth Circuit's unpublished opinions.[7]

Mr. Ortega argues that even if the impoundment and inventory search are legitimate, both are tainted by pretextual reasons. The argument has some legal purchase, *see Ibarra*, 955 F.2d at 1409–10, but it lacks a factual basis here. Even if the Court were to find that Officer Pulido was motivated in part by an investigatory goal, it would nonetheless be an insufficient basis for suppression. *See Bertine*, 479 U.S. at 372 (upholding inventory search where "there was no showing that the police, who were following standardized procedures, acted in bad faith or *for the sole purpose* of investigation") (emphasis added); *Haro-Salcedo*, 107 F.3d at 771–72

---

[7] *See United States v. Baskin*, 120 F. App'x 223, 224 (10th Cir. 2004) (affirming denial of suppression motion, in part because it would have been "unreasonable at that hour (about 3:00 a.m.) to attempt to contact someone who could pick up the car" in order to avoid impoundment); *United States v. Walker*, 81 F. App'x 294, 297 (10th Cir. 2003) ("Nothing in the Fourth Amendment requires a police department to allow an arrested person to arrange for another person to pick up his car to avoid impoundment and inventory.") (internal quotation marks omitted); *United States v. Moraga*, 76 F. App'x 223, 227–28 (10th Cir. 2003) (impoundment was reasonable even though arrestee's mother could "come and pick up the car" in "an hour"); *cf. United States v. Jackson*, 682 F.3d 448, 454–55 (6th Cir. 2012) (holding that officers acted reasonably in impounding vehicle stopped in a private driveway and rejecting argument that they should have first contacted the property owner or the vehicle's owner (the driver's fiancée)); *United States v. Cherry*, 436 F.3d 769, 775 (7th Cir. 2006) ("[T]he Fourth Amendment [does not] demand that police offer a motorist an alternative means of removing his vehicle that will avoid the need to tow it and conduct an inventory search.").

(upholding impoundment in "multiple-motivation scenario," where district court found that one reason for officers' impoundment of vehicle was to hold it "for further investigation by the DEA"); *United States v. Sanchez*, 720 F. App'x 964, 970 (10th Cir. 2018) (unpublished) ("[A] dual motive does not invalidate an otherwise lawful impound and inventory."). As established, impoundment in this case was entirely reasonable—even necessary. The inventory search that followed was a standard and to-be-expected part of that process.

The Court also rejects Mr. Ortega's contention that the Tenth Circuit's decisions in *Sanders* and *United States v. Woodard*, 5 F.4th 1148 (10th Cir. 2021), require a different outcome. In *Sanders*, the accused, Beverly Sanders, was arrested on an outstanding warrant as she and a companion exited a Goodwill store and walked toward her car, which was parked in the store's lot. *See Sanders*, 796 F.3d at 1243. Despite Ms. Sanders' offer to have a third party come pick up the vehicle and the fact that it was lawfully parked in the private lot, police officers "decided to impound [the car] out of fear that its contents, attractive exterior, and after-market accessories would lead to a break-in, particularly because it was located in a high-crime area after dark." *Id*. On appeal the Tenth Circuit affirmed the district court decision ordering the suppression of the illicit drugs discovered during the inventory search performed by the police. *See id*.

Similarly, in *Woodard*, the accused was stopped for law enforcement to serve a Protective Order and because he had a misdemeanor warrant. *Woodard*, 5 F.4th at 1151. Mr. Woodard was stopped in a convenience store parking lot and instructed to get out of the vehicle before being arrested. *Id*. His cell phone was seized from him and when he asked if he could place a call to have his car picked up, he was told, "I don't think so." *Id*. The decision to impound the vehicle had been made. *Id*. Critically, the search itself stemmed from a call

complaining to the police about him. *Id*. The caller said that Mr. Woodard was fighting a huge drug case, may have smoked PCP, had three previous gun cases, and violated a protective order. *Id*. After speaking with the caller, the police discovered that Mr. Woodard had an outstanding warrant for misdemeanor public intoxication. *Id*. With this information, the police looked for Mr. Woodard, planning to serve him with the protective order and execute the warrant. *Id*.

Mr. Ortega's situation is not analogous to either of these cases. Neither *Sanders* nor *Woodard* considered an impoundment authorized by *Opperman*. Instead, *Sanders* put the circumstances before the court in the following context:

> *Opperman* and *Bertine* establish two different, but not inconsistent, rules regarding when impoundments are constitutional. The *Opperman* decision establishes that some warrantless impoundments are constitutional: namely, those required by the community-caretaking functions of protecting public safety and promoting the efficient movement of traffic. Meanwhile, the *Bertine* decision establishes that other warrantless impoundments are unconstitutional: namely, those justified by police discretion that is either exercised as a pretext for criminal investigation or not exercised according to standardized criteria. However, *Bertine* and *Opperman* leave a large number of impoundments open to case-based reasonableness judgments: namely, those carried out pursuant to standardized criteria but not justified by the public safety and traffic control goals of *Opperman*.

*Id.* at 1245. The court then proceeded to provide guidance with respect to this third category of case, as necessary to decide the situation before it. As discussed at length above, the impoundment and search in *this* case fall under the authority of *Opperman* based on the factual findings established above: Mr. Ortega's truck was parked in a public roadway and blocked the only entrance to a highly trafficked auto park. Because of this, the Court will follow *Trujillo* and rule that impounding Mr. Ortega's truck was justified as an exercise of law enforcement community caretaking under *Opperman*.

Since the impoundment of Mr. Ortega's maroon truck was legitimate, the last point the Court will address is the legitimacy of the inventory search itself. An inventory search is a well-

18

defined exception to the warrant requirement. *See Lafayette*, 462 U.S. at 643. An inventory search of a lawfully impounded automobile pursuant to standard police procedures is reasonable even if it is conducted without a warrant and in the absence of probable cause based on the community care taking function. *See Bertine,* 479 U.S. at 369-73; *United States v. Tueller*, 349 F.3d 1239, 1243 (10th Cir. 2003) ("[I]nventory searches need not be supported by a warrant or probable cause."). "It is common practice for the police to conduct an inventory of the contents of vehicles they have taken into their custody or are about to impound." *Tueller*, 349 F.3d at 1243 (quotation omitted).

Because inventory searches are justified by their administrative purposes, such searches (1) "are reasonable only if conducted according to standardized procedures," and (2) the "policy or practice governing inventory searches should be designed to produce an inventory." *Id.* at 1243 (citations and quotation marks omitted). An inventory search cannot be a ruse for a general search to discover incriminating evidence. *Id.* (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990)). The government bears the burden of demonstrating reasonableness. *Taylor*, 592 F.3d at 1107); *see also Sanders*, 796 F.3d at 1244 ("The government bears the burden of proving that its impoundment of a vehicle satisfies the Fourth Amendment."). If agents act in bad faith or solely for the purpose of investigation, evidence may be suppressed. *See Taylor*, 592 F.3d at 1108. Here, the government has met its burden of demonstrating the reasonableness of the inventory search of Mr. Ortega's truck. The evidence described in briefing and presented at the evidentiary hearing does not suggest that the inventory search was pretextual. Rather, the evidence shows that the search was done according to standardized procedures, its necessity was heightened due to the condition of the truck's rear window, and it stopped as soon as contraband was discovered.

Thus, for the aforementioned reasons, the government has carried its burden of showing

that Officer Pulido's decision to impound Mr. Ortega's truck, after legally conducting a traffic

stop, was justified by the need to protect public safety or to facilitate the flow of traffic, and that

the subsequent inventory search was reasonable. Mr. Ortega, meanwhile, has failed to show that

law enforcement acted in bad faith or for an improper purpose in impounding the truck or in

conducting the subsequent inventory search. His Motion will therefore be denied.[8]

## CONCLUSION

**IT IS THEREFORE ORDERED** that Mr. Ortega's Motion to Suppress Evidence and

Statements Derived as a Result of an Invalid Seizure and Search [Dkts. 144, 168] is **DENIED**,

consistent with this Memorandum Opinion and Order.


ENTERED this 9th day of March 2023.

_____
MARTHA VÁZQUEZ
SENIOR UNITED STATES DISTRICT JUDGE

---

[8] Mr. Ortega included a Fifth Amendment suppression argument at the end of his Motion. *See* Dkt. 144 at 16. The government has represented that it will not be referencing at trial any of the statements placed at issue in the Motion. *See* Email from Elaine Ramírez to Dominique Fenton et al. (Dec. 9, 2022). Therefore, unless this changes, the Court will reserve judgement on this issue.