UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                              No. 21-CR-665 MV

MICHAEL THEODORE ORTEGA,

    Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Michael Theodore Ortega's Motion to Suppress Evidence Obtained as a Result of an Unlawful Search of his Home ("Motion") [Dkts. 153, 169]. In substance, Mr. Ortega's Motion is a Motion to Reconsider the Court's prior rulings in Dkt. 106.[1] The government filed a response in opposition [Dkt. 163]. Having considered the filings, exhibits, relevant law, and being otherwise fully informed, the Court finds that Mr. Ortega's Motion is not well-taken and is **DENIED.**

BACKGROUND

On May 24, 2021, agents with the Drug Enforcement Administration (DEA) arrived at Mr. Ortega's residence to execute a federal arrest warrant. Dkt. 88 at 4. At a pretrial hearing held on March 17, 2022, credible testimony established that the DEA was contacted after an earlier April 8, 2021 traffic stop. Mar. 17 Pretrial Hearing Tr. vol. 1 22:6–16 (available upon request). Mr. Ortega was not immediately charged following the April stop; therefore, following the return

---

[1] *See also* Dkt. 153 n.1, acknowledging as much ("Here, Mr. Ortega moves the Court to reconsider its previous ruling regarding the search of his home in order to prevent manifest injustice and to correct a clear error in that the Court was not provided with all the evidence in order to reach an informed decision.").

1

of a federal indictment and the issuance of an arrest warrant, DEA agents had to locate and arrest him. *Id.* 25:3–11. To do so, agents first examined the arrest warrant that had been active during the April 8 traffic stop. *Id.* That warrant listed Mr. Ortega's residence as 2620 8th St. NW, Albuquerque, NM 87107. Dkt. 90-1 at 1. DEA agents then conducted surveillance of that residence, "multiple times." Mar. 17 Pretrial Hearing Tr. vol. 1 25:16–26:11.

At approximately 5:00 p.m. on May 24, 2021, DEA Special Agent Traci Baca and a task force officer "conducted a drive by surveillance of Mr. Ortega's address [on 8th Street], and . . . observed Mr. Ortega's 1997 Chevy pickup parked in the driveway of his residence." *Id.* 26:20–24. This was the same truck that Mr. Ortega was driving during the April 8 stop, distinctive because it was maroon in color and "[t]he back window on the driver's side was busted out." *Id.* 23:711, 26:20–28:20; *see also* Gov. Ex. 30c.

In one of the house's windows, Agent Baca observed "a male individual with that shaved or bald head with facial hair . . . not wearing a shirt" and "peeking out." Mar. 17 Pretrial Hearing Tr. vol. 1 30:2–11. Having previously reviewed Mr. Ortega's driver's license photograph, as well as video from the April 8 stop, Agent Baca recognized the man in the window as Mr. Ortega. *Id.* 24:23–25:2, 30:4–7.

Multiple agents then approached the home and knocked on the door. *Id.* 30:17–31:14. A different man, Samuel, responded and told officers that Mr. Ortega was not home; however, "[a]fter asking [the man] several times to open the door, he finally complied." *Id.* 31:15–32:20, 33:1–2, 56:19–23. Officers asked Samuel—and another woman present inside the home— "to step outside of the residence." *Id.* 32:6–13. Samuel later told agents that he was living in the 8th Street house. *Id.* 57:7–15.

Agents entered the home through the kitchen, which was dark and cluttered. *Id.* 34:7–19. Proceeding into the living room, agents noticed several items of interest: (1) an unloaded rifle "off by the couch in front of the curtains," (2) "a gray gun case on the living room floor," and (3) "some paraphernalia on that black coffee table," including "what appear[ed] to be a pipe," "a lighter," "some white residue" in an ashtray, and "a scale." *Id.* 34:23–36:10; *see also* Gov. Exs. 30f, 31c. After securing the gun, agents "came to a locked door." Mar. 17 Pretrial Hearing Tr. vol. 1 37:7–17; *see also* Gov. Ex. 30g.

Agent Baca "knocked on the door, and called out Mr. Ortega's name, and asked him to open the door." Mar. 17 Pretrial Hearing Tr. vol. 1 39:15–15. Mr. Ortega eventually opened the door and was quickly handcuffed. *Id.* at 39:24–25. Inside the room where he was found, agents observed several additional items of interest: (1) a loaded black shotgun next to a bed, (2) "a knife on the floor next to the bed," and (3) an "air gun" that "was on like a shoe rack." *Id.* 40:7–19, 72:7–10; *see also* Gov. Ex. 30j.

Agents walked Mr. Ortega outside of the residence and placed him in the back seat of a marked car belonging to the Bernalillo County Sheriff's Unit. Mar. 17 Pretrial Hearing Tr. vol. 1 39:23–40:6. Around this time, he "asked agents if they could get one of his T-shirts from his bedroom, because he was not wearing a shirt at the time they placed him in handcuffs." *Id.* 42:11–13. Agents then finished their protective sweep of the home. *Id.* 74:23–25.

Task Force Officer Pena then administered *Miranda* warnings to Mr. Ortega, reading from a printed card. *Id.* 75:1–76:1. He was accompanied by Special Agent David Zimmerman. *Id.* 78:21–22. A short time later, Agent Baca asked Mr. Ortega for consent to search his residence. *Id.* 48:5–6, 76:6–11. No weapons were drawn during this conversation; Agent Baca described her tone as "very calm and normal." *Id.* 48:16–22. According to Agent Baca, Mr.

Ortega "was concerned that he would be charged with a stolen credit card," and officers "explained to him that [they] were not looking for credit cards." *Id.* 48:8–13. "After having a discussion with Mr. Ortega, he did sign the consent to search the residence." *Id.* 48:8–13. The consent form authorized agents to search the entire residence. *Id.* 69:22–70:1; *see also* Gov. Ex. 17.

Upon searching the entire house, law enforcement officers located additional evidence in the room where Mr. Ortega was found: (1) various types of ammunition, (2) "several blue pills" believed to be fentanyl, and (3) "a packet with a recipe . . . on how to manufacture methamphetamine." *Id.* 53:8–25. Officers came to believe that the room where these items were found was Mr. Ortega's bedroom. *Id.* 43:9–13. "[I]n the closet there was clothing that belonged to Mr. Ortega," as well as "a computer . . . on the bed that he said was his," and "utility bills with Mr. Ortega's name, and the address on the utility bills." *Id.* 41:13–18, 42:20–22, 53:2–7.

There was another room in the house, where officers believed that Samuel had been sleeping. *Id.* 71:16–23. In this room, officers found (1) ammunition that did not correspond to the two weapons that were found, and (2) "a plastic grocery bag that had some foil wrappings and some straws," which could potentially be used to ingest narcotics. *Id.* 70:2–16.

At the March 17, 2022 pretrial hearing, the government sought to admit the two firearms found at the 8th Street residence. *Id.* 56:1–4. The government also sought to admit "[t]he paraphernalia and methamphetamine residue," found in the living room, "[t]he ammunition," "[t]he fentanyl pills," and "the methamphetamine recipe." *Id.* At Mr. Ortega's first trial, he sought to exclude such evidence on, inter alia, Fourth Amendment grounds. Dkts. 79, 80. The Court overruled that objection, finding suppression was not merited. Dkt. 106 at 21–22. The

4

government will, presumably, seek to admit these same pieces of evidence at Mr. Ortega's second trial.

In asking the Court to "prevent manifest injustice and to correct a clear error" by revisiting that decision and the reasoning behind it, the only additional piece of evidence Mr. Ortega points to is a previously available video of himself discussing with law enforcement, and ultimately signing, a consent form to search his home. *See* Dkts. 153, 154 (Def. Ex. A).

## DISCUSSION

It is well-established in this Circuit that, although the Federal Rules of Criminal Procedure do not expressly authorize a motion for reconsideration, such motions are proper in criminal cases. *See United States v. Christy*, 810 F. Supp. 2d 1219, 1249 (D.N.M. 2011) (Browning, J.) (stating that in the criminal context, "courts ordinarily apply the same standards as those used in civil cases" for motions to reconsider), *aff'd*, 739 F.3d 534 (10th Cir. 2014). A district court may therefore amend its interlocutory orders prior to entry of final judgment. *See, e.g.*, *Van Skiver v. United States*, 952 F.2d 1241, 1243 (10th Cir. 1991) ("The Federal Rules of Civil Procedure do not recognize a 'motion to reconsider.' Instead, the rules allow a litigant subject to an adverse judgment to file either a motion to alter or amend the judgment . . . or a motion seeking relief from the judgment."); *Trujillo v. Bd. of Educ. of Albuquerque Pub. Sch.*, 212 F. App'x. 760, 765 (10th Cir. 2007) ("A district court has discretion to revise interlocutory orders prior to entry of final judgment."). Hence, "[w]hen a party seeks to obtain reconsideration of a non-final order, the motion is considered 'an interlocutory motion invoking the district court's general discretionary authority to review and revise interlocutory rulings prior to entry of final judgment.'" *Wagner Equip. Co. v. Wood*, 289 F.R.D. 347, 349 (D.N.M. 2013) (quoting *Wagoner v. Wagoner*, 938 F.2d 1120, 1122 n.1 (10th Cir. 1991)). The Court's authority is

sustained by the pragmatic reality that a "district court should have the opportunity to correct alleged errors in its dispositions." *Christy*, 739 F.3d at 539. Consequently, the district court enjoys "considerable discretion in ruling on a motion to reconsider." *Federated Towing & Recovery, LLC v. Praetorian Ins. Co.*, 283 F.R.D. 644, 651 (D.N.M. 2012) (citing *Phelps v. Hamilton*, 122 F.3d 1309, 1324 (10th Cir. 1997)).

The scope of reconsideration, however, is narrowly cabined and far more limited than in an ordinary appeal. That is because a motion to reconsider is an "inappropriate vehicle [ ] to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion." *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). Rather, "[g]rounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Id.*

This Court is always willing to reexamine both its legal reasoning and its weighing of the factual evidence upon a motion for reconsideration. Where newly available evidence or law calls into question a ground upon which the Court relied, or if the Court simply came to an erroneous conclusion on the existing record, it will revise its findings as necessary to correct clear error or prevent manifest injustice. This is not the case here. After carefully reexamining the record, viewing the video evidence submitted by Mr. Ortega, and considering the arguments advanced by the parties, the Court finds no clear error to correct or manifest injustice to prevent by disturbing its earlier findings. *See* Dkt. 106 at 21–22. Nor has Mr. Ortega identified any new evidence or law justifying such a reevaluation. Despite Mr. Ortega's best efforts, his motion to reconsider is indeed an "inappropriate vehicle [ ] to reargue an issue previously addressed by the court" because his motion "merely advances new arguments, or supporting facts which were

available at the time of the original motion." *Servants of Paraclete*, 204 F.3d at 1012. Because it is improper for the Court to revisit a previously adjudicated matter on grounds that do not fall into one of the three *Servants of Paraclete* categories, it will decline to do so here. *See id*.

But for what it is worth, the previously available video evidence presented by Mr. Ortega in the instant motion would not have changed the Court's earlier analysis. Mr. Ortega's conversation with law enforcement about the scope of their search does not undercut the voluntariness of his consent. Rather, it is clear from that conversation that his concern regarding the search dissipated when he was informed that officers were only looking for drugs and firearms, not stolen credit cards. The Court's review of the record therefore only reaffirms its belief in the constitutionality of the search effectuated on May 24, 2021.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Mr. Ortega's Motion to Suppress Evidence Obtained as a Result of an Unlawful Search of his Home [Dkts. 153, 169] is **DENIED**, consistent with this Memorandum Opinion and Order.

ENTERED this 4th day of April 2023.

_____
MARTHA VAZQUEZ
SENIOR UNITED STATES DISTRICT JUDGE